IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:12-CV-00171-FL

| | |
|---|---|
| AMBER PRATHER,<br><br>Plaintiff/Claimant,<br><br>v.<br><br>CAROLYN W. COLVIN, Commissioner of Social Security,<br><br>Defendant. | **MEMORANDUM AND RECOMMENDATION** |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-21, DE-26] pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Claimant Amber Prather ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the denial of her application for Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, this court recommends granting Claimant's Motion for Judgment on the Pleadings, denying Defendant's Motion for Judgment on the Pleadings, and remanding the case to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

### STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on October 17, 2008, alleging disability beginning September 24, 2008. (R. 61, 134). Her claim was denied initially and upon reconsideration. (R. 61-62). A hearing before the Administrative Law Judge ("ALJ") was held on April 26, 2010, at which Claimant was represented by counsel, and a witness and vocational expert

("VE") appeared and testified. (R. 25-60). On June 4, 2010, the ALJ issued a decision denying Claimant's request for benefits. (R. 7-24). On February 10, 2012, the Appeals Council denied Claimant's request for review. (R. 1-4). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 416.920a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) improper evaluation of medical opinion evidence; and (2) improper assessment of Claimant's RFC and credibility. Pl.'s Mem. at 6-19.

3

# FACTUAL HISTORY

## I. ALJs Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 12). Next, the ALJ determined Claimant had the following severe impairments: multiple sclerosis ("MS"), degenerative disc disease of the cervical spine, and anxiety. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild limitations in her activities of daily living and social functioning, moderate limitations with regard to concentration, persistence and pace, and no episodes of decompensation. (R. 13).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform medium work[1] requiring postural, environmental, manipulative, and mental restrictions (e.g., occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance; frequently kneel, stoop, crouch and crawl; avoid concentrated exposure to hazards, machinery, and heights; frequently use the left hand as an assisting hand and occasionally for lifting; and can perform unskilled work). *Id.* In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 17-19). At step four, the ALJ concluded Claimant had the RFC to perform the requirements of her past relevant work. (R. 19).

---

[1] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, she can also do sedentary and light work. 20 C.F.R. § 416.967(c).

4

The ALJ also noted that, considering Claimant's age, education, work experience and RFC, Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 19-20).

## II. Claimant's Background and Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 29 years old and had not worked since September 24, 2008. (R. 29, 134). Claimant lives with her fiancé and ten-year-old daughter. (R. 30-31). Claimant completed the tenth grade and obtained a GED. (R. 157). Claimant was last employed as a sales representative, selling industrial diamonds for use in the construction industry, where her duties included handling papers and calling customers. (R. 30, 168). Claimant's past work experience also includes drugstore cashier, flight attendant, and secretary. (R. 52-53).

Claimant explained numerous medical conditions supporting her disability claim and her inability to work full-time. These medical conditions include multiple sclerosis, anxiety, and depression. (R. 38). Claimant was diagnosed with MS in 2008, but has suffered from the condition since 2003. (R. 32). Claimant testified that she is unable to work due to fatigue, clumsiness, and forgetfulness. (R. 32). Claimant also experiences numbness in her left arm and hand, leg pain, diminished hearing in her left ear, and headaches. (R. 33-35, 55). Claimant is right handed and only uses her left hand when folding clothes, which she can only sustain for approximately five minutes due to burning pain in her left hand. (R. 35).

Claimant takes a number of medications, including Copaxone injections for her MS, Opana for bone pain in her legs, Maxalt for headaches, Neurontin for arm and leg pain, Seroquel and Amitriptyline for sleeplessness and depression, Percocet for pain, and Klonopin for anxiety. (R. 33, 35-36, 192). However, Claimant's coordination problems have not improved with the Copaxone

and she experiences redness and swelling at the injection site. (R. 33-34). Claimant's bone pain has improved with use of Opana, but is still severe (R. 37-38), and the headache medication is only effective for slight headaches, so she uses BC Powder for severe headaches, which provides more relief (R. 36). Claimant's depression is well managed by medication, but she still cries when under stress. (R.38-39). Claimant smokes marijuana approximately three times a month for pain relief. (R. 44).

Most days Claimant lays in bed, and if she does not rest well at night her symptoms are worse the following day. (R. 38). Claimant walks some for exercise, either in the parking lot or on the gym treadmill for approximately ten minutes. (R. 44-45). Claimant's grandmother does the laundry, and Claimant's fiancé does all other household chores (R. 41). Claimant limits her driving, because sitting for long periods causes her back pain. (R. 43).

### III. Betsy Wall's Testimony at the Administrative Hearing

Betsy Wall, Claimant's grandmother, testified at the administrative hearing. (R. 48-51). Wall lives 22 miles from Claimant and sees her two to three times a week (R. 48). Claimant sometimes calls Wall for comfort when in pain or upset (R. 49). Wall confirmed that she does Claimant's laundry and was not aware of any trips taken by Claimant in the past year. (R. 49-50).

### IV. Vocational Expert's Testimony at the Administrative Hearing

Steven D. Carpenter testified as a VE at the administrative hearing. (R. 51-58). After the VE's testimony regarding Claimant's past work experience (R. 52-53), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant with the following limitations: limited to unskilled work; 25 pounds frequently or 50 pounds occasionally; climb ramps and stairs occasionally; no climbing ladders, ropes, and scaffolds; balance

6

occasionally; stoop, kneel, crouch, and crawl frequently; avoid concentrated exposure to hazards such as machinery or heights; and frequently use the left hand for assisted lifting and occasionally for lifting. (R. 53). First, the ALJ asked whether such an individual could perform Claimant's past relevant work, and the VE responded that such an individual could perform the sales attendant job, which is a light job, low level semi-skilled, but generally performed as unskilled. (R. 53-54). The VE also testified that such an individual could perform work as a linen room attendant (DOT # 222.387-030), day worker (DOT # 371.687-014), and laundry laborer (DOT # 361.687-018).

The ALJ posed a further hypothetical, limiting the individual to light work, and the VE responded that such an individual could perform the sales attendant job as unskilled, as well as cashier II (DOT # 211.462-010), office helper (DOT # 239.567-010), and router (DOT # 222.587-038). (R. 56). The ALJ next asked the VE to assume that the hypothetical individual would be required to have frequent unscheduled breaks (at least two-thirds of the day), and the VE responded that such a limitation would preclude employment. (R. 56-57). The ALJ then asked the VE to assume that the hypothetical individual would have difficulty with her gait, endurance, and coordination, would be unable to do any repetitive tasks, and would be unreliable in dealing with customers due to emotional issues, and the VE responded that such limitations would preclude employment. (R. 57-58).

## DISCUSSION

### I. The ALJ's Evaluation of the Medical Opinions

Claimant contends that the ALJ improperly gave determinative weight to the February 2009 opinion of Dr. Rhonda Gabr; did not fully and fairly consider the DDS opinions; and did not properly assess Dr. Carraway's consultative evaluation. Pl.'s Mem. at 6-13 [DE-22].

7

Dr. Gabr, a neurologist with Raleigh Neurology Associates, initially treated Claimant after she was diagnosed with MS. (R. 247). Claimant declined hospital admission after being diagnosed, but returned to the hospital on October 8, 2008, with worsening symptoms, including decreased sensation of the left side of the body, unsteady gait, and blurred vision in the right eye. *Id.* Claimant was administered Solu-Medrol for three days and discharged. (R. 244). On October 16, 2008, Claimant saw Dr. Gabr for follow-up, and Dr. Gabr noted that Claimant's symptoms were "much improved after the Solu-Medrol but she continues to have a tingling in her left arm" and "jumpy vision." (R. 222). Dr. Gabr also noted no left-right motor asymmetries and that Claimant's gait was normal. *Id.* Dr. Gabr saw Claimant again on February 2, 2009 and assessed Claimant as follows:

> A twenty-eight year old with recently diagnosed multiple sclerosis with a constellation of symptoms that are worsening/unimproved after Solu-Medrol therapy and initiation of Copaxone. I am not sure why we are pursuing long-term disability at this time since she is just beginning treatment of her multiple sclerosis and I would expect that she would be at least average in her response to treatment and that she would improve. I would also consider that her burden of disease is quite low. Some of her symptoms may be augmented by her own anxiety and/or depression. She also has chronic headaches and these may be contributing to a significant degree. . . . She will continue her Klonopin for anxiety disorder and her gabapentin for left-sided pain. . . . At this time, Ms. Prather does not appear to be able to work, but I would not expect that to be a long-term situation. I did inform Ms. Prather of my opinion on that. At this time, she has significant difficulty with her gait, endurance, and coordination. She would not be able to do any repetitive tasks. She has emotional lability and I would not consider her to be a very reliable employee in terms of dealing with customers. So, certainly she meets the criteria for disability at this time but, again, a long-term disabling situation would not be expected or predicted for her. We will plan to touch base with her as routinely scheduled in four to six months. She will continue her Copaxone . . . .

(R. 406-07).

Claimant sought a second opinion with regard to the treatment of her MS, and was referred by Rock Quarry Family Medicine, Claimant's primary care provider, to the UNC Department of

8

Neurology. (R. 450). On May 27, 2009, Claimant saw Dr. Matthew Ostrander and Dr. Silva Markovic-Plese, and it was noted that Claimant felt worse on Copaxone and had many complaints, including pain, weakness, numbness, and fatigue. (R. 454). On June 8, 2009, Claimant had a follow-up visit with Luigi Troiani, a PA-C in the UNC Department of Neurology, and reported doing "okay" on Copaxone, that she had daily headaches, worsening since a fall where she hit her head, poor short-term memory, and difficulty with balance. (R. 446-47). Comparison of brain MRIs from October 2008 and June 2009 showed no significant difference. (R. 447). Troiani determined that Claimant should continue on Copaxone and referred her to the pain clinic for her ongoing chronic pain and headaches. (R. 448).

On September 3, 2009, Claimant again saw Troiani for a scheduled follow-up visit, reporting that the Maxalt prescribed for her headaches was "okay," that she still had pain in her legs but did not want to increase the Fentanyl patch, and that she had not yet arranged to visit the pain clinic. (R. 443). Claimant was noted to be tolerating Copaxone well, but still in a significant amount of pain. (R. 444). At Claimant's next routine follow-up visit on December 10, 2009, Claimant reported that the Maxalt prescribed for her headaches did not work, that her primary care physician changed her pain medication, that her short term memory was worsening, and that she had left-sided numbness, dizziness with some falls, and was dragging her feet. (R. 438-39). Troiani noted that Claimant was doing well on Copaxone and prescribed new medications for Claimant's headaches and decreased energy. (R. 440).

On March 24, 2010, Troiani opined that Claimant was permanently disabled from MS, explaining as follows:

> Multiple sclerosis is an unpredictable illness. In Ms. Prather's case she

9

experiences lower extremity weakness causing her to trip or run into walls. She reports left sided numbness and weakness causing sensory changes such as decreased vibration, pinprick and temperature sensation on physical exam. Chronic neuropathic pain can be a complication of MS and Ms. Prather experiences this in her lower extremities. She does get some relief with Neurontin. She also reports cognitive issues such as difficulty with word finding or memory recall. Along with any chronic illness a person may experience depression and Ms. Prather is taking Zoloft for this.

>An MS flare or exacerbation is impossible to predetermine and no one can say how long an episode will last. Due to the nature of Multiple Sclerosis Ms. Prather is unable to maintain regular attendance or production in any employment. She requires frequent, unscheduled breaks making her an unappealing candidate for most employers. She is permanently disabled from all competitive employment and will require a lifetime of medical treatment and prescription medicines.

(R. 520). Troiani had previously noted that Claimant's MS was "relapsing remitting" (R. 440), which is characterized by "clearly defined flare-ups (also called relapses, attacks, or exacerbations)" that are "episodes of acute worsening of neurologic function . . . followed by partial or complete recovery periods (remissions) free of disease progression." *Osorio v. Barnhart*, No. 04 CIV. 7515 (DLC), 2006 WL 1464193, at *2, n.6 (S.D.N.Y. May 30, 2006) (citing National Multiple Sclerosis Society, http://www.nationalmssociety.org/about-multiple-sclerosis/what-we-know-about-ms/what-is-ms/index.aspx) (last visited Aug. 20, 2013).

The ALJ concluded that Dr. Gabr's opinion was well supported by the record and accorded it substantial weight. (R. 18). The ALJ found Troiani's opinion "not supported by the longitudinal objective record, including the Raleigh Neurology Associates, Inc., records and is therefore, accorded minimal weight." *Id.* The ALJ further stated that Troiani's opinion was not supported by the clinical notes of record or Dr. Gabr's February 2009. (R. 19).

It appears that the ALJ gave substantial weight only to Dr. Gabr's opinion that Claimant's condition was expected to improve with treatment and gave minimal weight to Troiani's opinion,

10

because it was contradicted by Dr. Gabr's earlier prognosis that Claimant's condition would improve with treatment. However, a careful review of the record indicates that Dr. Gabr's clinical findings are, in fact, more consistent with Troiani's opinion than contradictory.

Dr. Gabr saw Claimant on two occasions, in October 2008, when Claimant was first diagnosed with MS and in a follow-up visit four months later in February 2009. (R. 222, 406). Dr. Gabr's February 2009 opinion, to which the ALJ accorded "substantial weight," was that Claimant's symptoms were "worsening/unimproved after Solu-Medrol therapy and initiation of Copaxone" and that she could not work due to "significant difficulty with her gait, endurance, and coordination," inability to do any repetitive tasks, and emotional lability. (R. 406-07). Troiani began treating Claimant for MS in May 2009 and the records indicate he was still treating her in September 2011. (R. 522). Troiani's opinion, approximately one year after Dr. Gabr last saw Claimant, was that Claimant could not work due to lower extremity weakness causing her to trip or run into walls, left-sided numbness, and neuropathic pain. (R. 520). Therefore, it appears that Troiani's opinion is not contradicted by any medical findings made by Dr. Gabr, but only by Dr. Gabr's prognosis that Claimant would ultimately react positively to treatment, which is not borne our by substantial evidence of record.

Pursuant to the regulations, physicians' assistants are not considered acceptable medical sources. *See* 20 C.F.R. § 416.913(a) (defining "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). Nonetheless, "evidence from other sources," such as physicians' assistants, may be used "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work . . . ." *Id.* § 416.913(d) (including physicians' assistants as "other

11

sources"); *see also* S.S.R. 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) (explaining the opinions from "other [medical] sources ... may provide insight into the severity of [a claimant's] impairment and how it affects [a claimant's] ability to function"). Since medical sources, such as physicians' assistants, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians . . . [o]pinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." S.S.R. 06-03p, 2006 WL 2329939, at *3. Indeed, "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source." *Id.*

While Troiani's opinion is that of a non-acceptable medical source, Troiani had a significantly greater treatment relationship with Claimant than did Dr. Gabr and was, in fact, Claimant's primary treatment provider for her MS. *See id.*, at *5 ("[I]t may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.") Furthermore, Troiani's opinion was supported by both his treatment notes, the medical findings of Dr. Gabr, and treatment notes from Claimant's primary care provider. (R. 417-26, 438-55, 406).

The Commissioner contends that the ALJ's conclusion that Claimant's condition had in fact improved is supported by substantial evidence in the record and points to Troiani's note of December 10, 2009, that Claimant was "doing well on Copaxone and will continue on this therapy" (R. 440).

12

Def.'s Mem. at 10-11 [DE-27]. However, the fact that Claimant was responding to medication does not *per se* contradict Troiani's opinion that Claimant continued to suffer from lower extremity weakness causing her to trip or run into walls, left sided numbness and weakness causing sensory changes, chronic neuropathic pain in her lower extremities, and cognitive issues and that, as a result, Claimant would require frequent, unscheduled breaks and would be unable to maintain regular attendance or production in any employment. (R. 520). *See Ware v. Astrue*, No. 5:11-CV-446-D, 2012 WL 6645000, at *3 (E.D.N.C. Dec. 20, 2012) (concluding that the ALJ failed to give good reasons for discounting a treating source's opinion, where the ALJ's reasons offered–that the claimant is motivated for treatment and responds positively to medication–were not inconsistent with the treating sources opinion that the claimant was not capable of working).

Moreover, a September 13, 2011 MRI indicating that Claimant had multiple new lesions in her brain and potentially new lesions on her thoracic spine, which was submitted to the Appeals Council, supports Claimant's contention that her condition was not, in fact, improving. (R. 522-24). Although this evidence was not before the ALJ at the time of decision, the court must consider it, where is was admitted, considered, and made part of the record by the Appeals Council prior to the denial of review. (R. 1-4). *See Sanders v. Colvin*, No. 5:11-CV-773-D, 2013 WL 3777198, at *4 (E.D.N.C. July 18, 2013) ("Where, as here, the Appeals Council considers additional evidence before denying the claimant's request for review of the ALJ's decision, the court must review the record as a whole, including the [additional] evidence, in order to determine whether substantial evidence supports the Secretary's findings.") (internal quotation marks omitted) (quoting *Felts v. Astrue*, No. 1:11CV00054, 2012 WL 1836280, at *1 (W.D.Va. May 19, 2012) (quoting *Wilkins v. Sec'y Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir.1991)). Despite the Commissioner's assertion

to the contrary, this evidence does have relevance as to whether Claimant's condition was improving prior to June 4, 2010, and tends to support Claimant's assertions that she was not, in fact, getting better with treatment. Accordingly, the weight accorded by the ALJ to Dr. Gabr's and Troiani's medical opinions is not supported by substantial evidence.

Likewise, the ALJ failed to sufficiently explain why he accorded substantial weight to the State agency medical and psychological consultants' opinions, which formed the basis for the ALJ's conclusion that Claimant could perform medium work with limitations. (R. 18). Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 416.927(c)(1). The ALJ offered no explanation with regard to the substantial weight accorded these non-examining source opinions, which are contradicted by the opinions of Dr. Gabr and Troiani, who were examining sources. *See Godfrey v. Astrue*, 861 F. Supp. 2d 683, 687 (E.D.N.C. 2012) (concluding that ALJ's failure to articulate a reason for according controlling or great weight to the State agency consultant's opinion was error, particularly in light of treating and examining source opinions to the contrary); S.S.R. 96–2p, 1996 WL 374188, at *2 (July 2, 1996). Accordingly, the ALJ erred in his assessment of the State agency consultants' opinions.

Finally, Claimant contends that the ALJ improperly assessed the opinion of Dr. Carraway, an examining DDS consultant. Specifically, the ALJ noted Dr. Carraway's findings that Claimant has mild impairment in short term memory and attention and concentration, mild to moderate impairment in immediate memory, and that Claimant's ability to perform simple, routine, repetitive tasks is limited by Claimant's objective physical findings and somatic complaints with mild to

14

moderate impairment in stress tolerance. *Id.* The ALJ accorded Dr. Carraway's opinion "some weight" in light of the longitudinal objective record. (R. 18). However, it is unclear what part of Dr. Carraway's opinion the ALJ accorded weight, as the only arguably mental restriction placed on Claimant's RFC was that she perform unskilled work. 20 C.R.F. § 416.968(a). The ALJ twice noted Dr. Carraway's observation that Claimant was "melodramatic and theatrical" (R. 16-17, 19, 333), but failed to make note of Dr. Carraway's assessment that Claimant's symptoms appeared "forthrightly reported" (R. 335). Furthermore, there is substantial evidence in the record to support the negative impact of stress on Claimant's cognitive function, including the consultative opinion of Dr. Albertson, to which the ALJ accorded substantial weight. (R. 387, 447). Accordingly, the ALJ did not sufficiently explain his assessment of Dr. Carraway's opinion.[2]

In sum, the ALJ erred in evaluating the medical opinions of Dr. Gabr, Troiani, Dr. Carraway and the non-examining State agency consultants. Therefore, it is recommended that the case be remanded so that the ALJ can evaluate the medical opinions in accordance with SSR 96-2p and 20 C.F.R. § 416.927. Because the ALJ's handling of the medical opinion evidence is dispositive, the issues raised by Claimant regarding the ALJ's RFC and credibility analysis need not be considered. However, where medical opinion evidence is integral in determining Claimant's RFC and credibility, the ALJ should reevaluate both his RFC and credibility determinations on remand. *See* S.S.R. 96-7p, 1996 WL 374186, at *1 (July 2, 1996); S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996). Finally, the ALJ should include in his consideration of the case on remand the September 13, 2011 MRI indicating that Claimant had multiple new lesions in her brain and potentially new lesions on

---

[2] The ALJ also failed to assign a weight to the opinion of Dr. Sandy Kimmel, who conducted a consultative physical examination, although the ALJ did discuss Dr. Kimmel's findings. (R. 16-18, 338-40).

15

her thoracic spine. (R. 522-24).

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings [DE-21] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE-26] be DENIED, and the case be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, this the 20th day of August 2013.

Robert B. Jones, Jr.
United States Magistrate Judge